**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| NEWMONT NEVADA ENERGY INVESTMENT, LLC, a Nevada limited liability company, | ) ) ) | No. 3:12-cv-00349-RCJ-VPC |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER** |
| SIERRA PACIFIC POWER COMPANY d/b/a NV ENERGY, a Nevada corporation, | ) ) ) ) | |
| Defendant. | ) | |
| _____ | | |

## I. Background

### A. Factual Background

Plaintiff Newmont Nevada Energy Investment, LLC ("Newmont") is a Nevada limited liability company. (Compl. ¶ 1 (#1-4).) Defendant Sierra Pacific Power Company d/b/a NV Energy ("SPPC") is a Nevada corporation with its principal place of business in Reno, Nevada. (Id. ¶¶ 3-4.) SPPC is an investor-owned utility company that owns and operates facilities for the purchase, generation, transmission, distribution and sale of electricity and natural gas within its certified areas within the State of Nevada pursuant to certificates of public convenience and necessity issued by the Public Utilities Commission of Nevada. (Id. ¶ 5.) SPPC generally provides its utility services in northern Nevada. (Id.) Newmont owns a 203 megawatt (MW) coal-fired power plant facility near Dunphy in Eureka County, Nevada (hereinafter, "TS Power Plant"). (Id. ¶ 6.) The TS Power Plant is located within the certificated service territory of SPPC.

Prior to constructing the TS Power Plant, Newmont entered into a series of agreements

with SPPC for the purchase of power from the TS Power Plant. (Id. ¶ 7.) To facilitate the purchase of power from the TS Power Plant, Newmont's parent company, Newmont USA Ltd. ("Newmont USA") and SPPC entered into an Interconnection and Operation Agreement ("Interconnection Agreement") memorializing the parties' agreement to interconnect the TS Power Plant to SPPC's transmission system and the parties' obligations going forward. (Id. ¶¶ 8-9.) With regards to the installation of the interconnection facilities, the Interconnection Agreement provides that Newmont USA as the Generator "shall be responsible for the design, construction, installation, ownership, operation and maintenance of the Generator Interconnection Facilities." (Id. ¶ 10; Interconnection Agreement[1] at ¶ 3.4.1 (#1-1).) The Interconnection Agreement also provides that Newmont USA as Generator "shall procure any and all equipment necessary for Generator to construct and install the Generator Interconnection Facilities." (Compl. ¶ 11 (#1-4); Interconnection Agreement ¶ 3.4.2 (#1-1).) The Generator Interconnection Facilities are defined as:

> [T]he equipment and facilities owned, operated and maintained by Generator from the Facility to the Ownership Point, including modification, additions, or upgrades made to such facilities, which, in conjunction with the Company Interconnection Facilities, are necessary to connect the [TS Power Plant] to the Transmission System, . . . Generator Interconnection Facilities shall include Generator's Protective Equipment and those Joint Use Facilities on the Generator's side of the Ownership point.

(Compl. ¶ 12 (#1-4); Interconnection Agreement at ¶ 1.21 (#1-1).) With regards to SPPC's obligations for the initial installation of the facilities, the Interconnection Agreement provides that SPPC "shall be responsible for the design, procurement, construction, installation, ownership, operation and maintenance of the Company Interconnection Facilities and System Upgrades as set forth in Appendix A." (Compl. ¶ 13 (#1-4); Interconnection Agreement ¶ 3.5.1 (#1-1).) The Interconnection Agreement further provides that at Newmont USA's expense, subject to Article 5 of the Interconnection Agreement, SPPC "agrees to procure any and all equipment necessary for [SPPC] to construct and install the Company Interconnection Facilities and System Upgrades." (Compl. ¶ 14 (#1-4); Interconnection Agreement ¶ 3.5.2 (#1-

---

[1] The Interconnection Agreement, along with other agreements referenced in the complaint, shall be deemed incorporated by reference for purposes of this Order.

2

1).) The design and construction of the Company Interconnection Facilities and initial System Upgrades is to be completed at Newmont USA's expense. (Compl. ¶ 14 (#1-4); Interconnection Agreement ¶¶ 3.5.3, 3.5.4 (#1-1).) However, after installation, SPPC "shall own, operate, maintain, and repair or replace System Upgrades at [SPPC's] expense." (Compl. ¶ 14 (#1-4); Interconnection Agreement ¶ 3.5.4 (#1-1).)

SPPC filed the Interconnection Agreement with the Federal Energy Regulatory Commission ("FERC"). (Mot. to Remand Ex. 4[2] (#6-4).) On February 10, 2004, the FERC issued its letter order which accepted the Interconnection Agreement for filing. (Mot. to Remand Ex. 5 (#6-5).) The Order provides that "[t]his acceptance for filing shall not be construed as constituting approval of the referenced filing." (Id.)

On March 23, 2006, the Interconnection Agreement was amended by an agreement between SPPC and Newmont, assignee of the rights of Newmont USA, in a document entitled First Amendment to Interconnection and Operation Agreement ("First Amendment"). (Compl. ¶ 16 (#1-4).) The First Amendment further clarifies the type and specifications of all facilities and system upgrades necessary for the interconnection, as originally defined in Appendix A of the Interconnection Agreement. (Id. ¶ 17.) Appendix A to the First Amendment provides, *inter alia*, that the interconnection of the TS Power Plant to the SPPC transmission system did not require any network upgrades, distribution upgrades, and that there were no other affected system upgrades. (Id. ¶ 20; First Amendment App. A ¶¶ 10-12 (#1-2).) Appendix A to the First Amendment also provides that Newmont is only responsible for the operation and maintenance costs following initial installation for the Generator and Company Interconnection Facilities. (Compl. ¶ 22 (#1-4); First Amendment App. A ¶ 15 (#1-2).)

With respect to modifications to the parties' facilities following commercial operation of the TS Power Plant, the Interconnection Agreement provides that each party shall use due

---

[2] Newmont requests in its motion to remand (#6) that the Court take judicial notice of the entries in the FERC docket and the order issued by the FERC, attached to the motion to remand (#6) as Exhibit 4 and Exhibit 5. The Court shall take judicial notice of these documents as they are matters of public record. United States v. 14.02 Acres of Land More or Less in Fresno County, 547 F.3d 943, 955 (9th Cir. 2008).

diligence to minimize the adverse impact to the other party, including the requirement that SPPC take any action necessary to promptly reestablish the connection of the generation facility to the transmission system or secure such services necessary to deliver electricity to the transmission system, and that SPPC shall be responsible for the costs of mitigation of any such adverse impact during the course of installing any additions, modifications or replacements to its facilities. (Compl. ¶ 24 (#1-4); Interconnection Agreement ¶ 3.12.1 (#1-1).) The Interconnection Agreement further provides that unless required by applicable laws and regulations and reliability criteria, Newmont (as assignee to the original contracting party, Newmont USA) "shall not be responsible for the costs of any additions, modifications or replacements made to the Company Interconnection Facilities, System Upgrades or the Transmission System by [SPPC]." (Compl. ¶ 26 (#1-4); Interconnection Agreement ¶ 5.3.1 (#1-1).) The Interconnection Agreement provides that Newmont shall bear the costs if required as a result of additions, modifications, or replacements made by Newmont, but Newmont is not required to make any modifications to the Generator Interconnection Facilities unless such change is required due to "(I) a change in the Facility; (ii) a change in the Applicable Laws and Regulations that require a change in the Interconnection Facilities; or (iii) a change on the Transmission System which is required by Good Utility Practice." (Compl. ¶¶ 26- 27 (#1-4); Interconnection Agreement ¶¶ 4.1.3, 5.3.1 (#1-1).)

Since May 2008, the TS Power Plant has been continuously operated and electricity generated by the TS Power Plant has been transported on the SPPC transmission system through the interconnection at the Falcon Substation. (Compl. ¶ 28 (#1-4).) On February 1, 2010, SPPC proposed and subsequently obtained approval for the construction of a new and separate 500 kV transmission line to be built on the eastern side of Nevada, commonly referred to as the "One Nevada Line" or "ON-Line." (Id. ¶ 30.) In an application to the Public Utilities Commission of Nevada ("PUCN") for approval of the development and construction of the ON-Line, SPPC identified the primary purpose of the ON-Line to be connecting the two utility service territories of SPPC in northern Nevada to Nevada Power Company's ("NPC") service territory in southern Nevada. NPC is a wholly-owned subsidiary of NV Energy, Inc.,

parent company to SPPC. (Id. ¶¶ 5, 33.) The PUCN approved the application and ordered that the costs associated with the ON-Line be borne by the customers that receive the benefit of the ON-Line, that is, 95% of the costs to NPC and 5% to SPPC. (Id. ¶ 38.) Newmont is a customer in the SPPC service territory. (Id. ¶ 39.) Newmont alleges that SPPC's planned installation of series compensation equipment at the Falcon Substation is unrelated to the interconnection of the TS Power Plant, is not designed for the benefit of the TS Power Plant, is not requested by Newmont, is not due to a change in the TS Power Plant, and is not required by a change in any applicable laws or regulations. (Id. ¶ 44.)

As part of the construction of the ON-Line, SPPC plans to install certain network upgrades at the Falcon Substation to facilitate the connection to the new ON-Line. (Id. ¶ 40.) On August 14, 2009, Newmont received a letter from SPPC in which SPPC informed Newmont of its plans to upgrade its transmission system, including the installation of 345 kV series compensation equipment at the Falcon Substation. (Id. ¶ 41.) The letter further explained that preliminary studies conducted by SPPC demonstrate that this equipment, under studied emergency conditions, would cause subsynchronous resonance (SSR) effects on the TS Power Plant which could result in catastrophic generator failure. (Id. ¶ 42.) The TS Power Plant is valued at in excess of half a billion dollars. (Id.) Newmont states that SPPC's August 14, 2009 letter provided that SPPC is willing to accept all of Newmont's reasonable engineering service costs required to prepare and provide data concerning certain specifications of the TS Power Plant that SPPC requests. (Id. ¶ 45.) In addition, the letter also stated that "all reasonable equipment and mitigation costs associated with the installation of the 345 kV series equipment will be the responsibility of [SPPC]." (Id.)

On October 15, 2009, SPPC sent another letter to Newmont in which SPPC stated that Newmont must bear the cost of the mitigation equipment to prevent catastrophic failure of the TS Power Plant. (Id. ¶ 48.) SPPC's October 15, 2009 letter cites to an alleged guideline of the Western Electric Coordinating Council ("WECC") which SPPC represented as being approved by WECC on May 6, 2003. (Id. ¶ 49.) According to SPPC's letter, the purported guideline provided that "[i]t is the responsibility of each generating equipment owner to study

5

SSR problems and identify and implement (if desired) appropriate countermeasures for the protection and safe operation of their equipment." (Id.) Newmont alleges that the guideline cited by SPPC has never been adopted by WECC and is, therefore, non-binding. (Id. ¶ 50.)

Newmont alleges that after its own studies, it has confirmed that SPPC's installation of the series compensation equipment will result in SSR that may cause catastrophic failure of ths TS Power Plant. (Id. ¶ 51.) In order to prevent such failure, Newmont claims that it will be necessary to install a torsional stress relay ("TSR") at the TS Power Plant, which is estimated to cost approximately $1 million. (Id. ¶¶ 52-53.)

Newmont alleges that requiring Newmont to pay for such expenses is a breach of the Interconnection Agreement and First Amendment, alleging that under those agreements, SPPC is responsible for those costs. (Id. ¶ 55.)

In addition, Newmont alleges that there are other damages it will suffer as a result of SPPC's actions. In a separate agreement, the WSPP Confirmation, provided in accordance with the Western Systems Power Pool Agreement version, effective March 16, 2007, the parties agreed that Newmont must provide electric power as requested and dispatched by SPPC, and must purchase power from alternative sources if the TS Power Plant is unable to provide electric power as required. (Id. ¶¶ 63-65.) The TSR, necessitated by SPPC's actions to protect the TS Power Plant, will automatically "trip" the system and shut off the operation of the generator to prevent failure of the TS Power Plant if it detects activity that indicates stress upon the facility. (Id. ¶ 52.) Newmont alleges that each "trip" by the TSR will cause up to fifteen hours of non-operation and inability to supply full output power. (Id. ¶ 68.) Repeated tripping or shut-down will cause unnecessary wear and tear, reducing the useful life of the generation equipment. (Id. ¶ 69.) Newmont alleges that SPPC has indicated that it intends to run the series capacitors at the Falcon Substation at 70% capacity, which Newmont claims will cause the TSR to trip on a frequent basis. (Id. ¶ 70.) Such tripping, Newmont claims, would rarely occur, if at all, if SPPC were to operate the series capacitors at 60% capacity. (Id.) The TS Power Plant has operated 97% of the time since it began commercial operation, but its significant reliability will suffer as a result of SPPC's actions, and Newmont

may have to purchase power elsewhere at higher costs in order to compensate.  (Id.)

**B. Procedural Background**

On June 1, 2012, Newmont filed its complaint against SPPC in the Second Judicial District Court of the State of Nevada in and for the County of Washoe, alleging claims for specific performance and declaratory relief based on the agreements between the parties. (Compl. ¶¶ 80, 85, 89 (#1-4).) On June 25, 2012, SPPC removed (#1) the action to this Court on the basis of federal question jurisdiction because the Interconnection Agreement allegedly "constitutes a federal tariff and the equivalent of a federal law or regulation."  (Notice of Removal ¶ 5(b) (#1).)

On July 2, 2012, SPPC filed its motion to dismiss (#3).  On July 16, 2012, Newmont filed a motion to remand to state court (#6).  On September 11, 2012, Newmont filed a motion for leave to file surreply (#22) to SPPC's reply (#27) in support of the motion to dismiss (#3).

## II. Newmont's Motion to Remand (#6)

**A. Legal Standard**

A defendant may remove an action from state court to federal court if the federal court would have had original subject matter jurisdiction over the action.  28 U.S.C. § 1441(a). Original jurisdiction must be based either on a claim involving the Constitution, laws, or treaties of the United States, 28 U.S.C. § 1331, or on diversity of citizenship, which applies to suits totaling more than $75,000 in controversy between citizens of different states, 28 U.S.C. § 1332(a).  Federal jurisdiction under 28 U.S.C. § 1332(a) requires "complete diversity of citizenship between the parties opposed in interest."  Kimtz v. Lamar Corp., 385 F.3d 1177, 1181 (9th Cir. 2004).

A motion to remand is the proper procedure for challenging removal.  Babasa v. LensCrafters, Inc., 498 F.3d 972, 974 (9th Cir. 2007).  The removal statute must be strictly construed to limit the federal court's authority to that expressly provided by Congress and to protect the states' judicial powers.  Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941).  In determining whether the action is one in which the federal court has original

jurisdiction, the basis for federal jurisdiction must be determined from the face of the complaint. Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C., 992 F.2d 932, 934 (9th Cir. 1993). Any doubt about the right of removal is resolved in favor of remand. Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1252 (9th Cir. 2006). The party seeking removal bears the burden of establishing by a preponderance of the evidence that all removal requirements are met. Etheridge v. Harbor House Rests., 861 F.2d 1389, 1393 (9th Cir. 1988).

**B. Discussion**

Newmont claims that this action concerns only state law causes of action, specifically, breach of contract of the Interconnection Agreement and the First Amendment to the Interconnection Agreement. SPPC claims that federal law governs because Newmont's claims require interpretation of the Interconnection Agreement, which was filed with and accepted by the FERC. SPPC states that the Interconnection Agreement is not effective until it has been accepted by FERC and does not exist independently of its FERC filing, and therefore, the rights, duties and liabilities Newmont asks the Court to declare and enforce are created under FERC regulations and orders and are subject to federal jurisdiction.

The Federal Power Act ("FPA"), 16 U.S.C. § 825, applies to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce. 16 U.S.C. § 824 (b). "Part II of the Federal Power Act, codified at 16 U.S.C. §§ 824-824m, delegates to the [FERC] '*exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.'" California ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831, 849 (9th Cir. 2004) (internal citations omitted) (emphasis in original). The FPA provides that federal courts shall have exclusive jurisdiction of violations of the FPA or the rules, regulations, and orders thereunder, and any suits or actions to enforce any liability or duty created by, or to enjoin any violation of, the FPA or any rule, regulation, or order thereunder.[3] 16 U.S.C. § 825p. SPPC argues that this provision is the basis for federal

---

[3] However, federal regulation under the FPA extends only to "those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a).

8

question jurisdiction in this action.

In 1996 the FERC issued Order No. 888, which requires public utilities to have on file open access non-discriminatory transmission tariffs. 61 Fed. Reg. 21,540, 21,552 (FERC May 10, 1996) (hereinafter Order No. 888); Central Iowa Power Co-op. v. Midwest Indep. Transmission Sys. Operator, Inc., 561 F.3d 904, 907 (8th Cir. 2009). SPPC 's Open Access Transmission Tariff ("OATT") was filed and accepted in FERC Docket No. ER02-2609. The Interconnection Agreement was accepted by FERC in February of 2004 with an effective date of December 5, 2003. (Mot. to Remand Ex. 4 (#6-4).) SPPC's opposition (#19) to the motion to remand (#6) essentially argues that federal question jurisdiction exists because the Interconnection Agreement was filed with and accepted by the FERC.

We disagree. "[T]he FPA does not provide FERC with exclusive jurisdiction over the breach of a FERC approved contract." In re Mirant Corp., 378 F.3d 511, 519 (5th Cir. 2004). Newmont does not allege that SPPC violated the FPA or any rules, regulations or orders of the FERC. Nor are Newmont's claims directly or indirectly related to enforcing regulations issued pursuant to the FPA, as in Dynegy. See Dynegy, 375 F.3d at 843. Newmont's complaint alleges that the Interconnection Agreement and the First Amendment to that agreement provide that Newmont shall not be responsible for costs associated with the installation of the TSR. While SPPC disputes that the agreements contain such a provision, SPPC cannot show that this routine interpretation of contractual terms involves any provisions of the FPA or orders and regulations of the FERC. When contract language "inform[s] the resolution of this matter" rather than the federal tariff itself, there is no federal question jurisdiction. Pacific Gas and Elec. Co. v. Ariz. Elec. Power Coop., Inc., 479 F.Supp.2d 1113, 1125 (E.D. Cal. 2007). The issue here is simply which party, under the terms of the agreements between Newmont and SPPC, will shoulder costs necessitated by SPPC's modifications to its transmission system.

///
///
///

9

The FERC also finds that routine matters of contract interpretation, not involving tariffs, fall outside of its exclusive jurisdiction.[4]  In Rio Grande Elec. Coop., Inc. v. Cent. Power and Light Co., the FERC issued an order dismissing a complaint centered around a termination fee dispute.  77 FERC ¶ 61,245, 61,975 (1996).  In Rio Grande, plaintiff sued defendant in state court for payment of the termination fee, and the state court found that the dispute was within its jurisdiction and not a matter within the exclusive or primary jurisdiction of the FERC.  Id.  The Texas court then abated the action for six months to allow the FERC to decide whether it would assert jurisdiction.  Id.  The FERC found that the termination fee dispute involves "a routine matter of contract interpretation which is best left for the court."  Id. at 61,978.  However, the FERC may exercise its primary jurisdiction over a contractual dispute if the dispute requires special expertise or uniformity of interpretation, or involves broad issues of regulatory policy or statutory interpretation.  Id. at 61,977-78.  When the issue requires interpretation of the contract, not the FPA or the FERC's regulations or policy, the matter is best left to the court system.  Id. at 61,978.

Likewise, the FERC dismissed a petition involving a dispute in which plaintiff alleged that it was excused from continued performance under a power agreement accepted by the FERC because defendant closed a nuclear plant ant and consented to the liquidation of its assets.  Portland Gen. Elec. Co., 72 FERC ¶ 61,009, 61,019-20 (1995).  After plaintiff filed suit in state court, defendant filed a petition with the FERC, arguing that the FERC is the appropriate body to decide whether to modify, rescind, or terminate a filed rate schedule, and therefore is the only appropriate forum to resolve whether the contract was breached and whether one of the parties is in default.  Id. at 61,020.  The FERC dismissed the petition because the complaint in state court "does not challenge the reasonableness of [defendant's] rates under the Power Agreement, or any term and condition of service."  Id. at 61,021.  The

---

[4] While SPPC is not arguing that FERC has exclusive jurisdiction in its opposition to the motion to remand, SPPC does make that argument in its motion to dismiss (#3).  While the following cases involve the FERC's interpretation of whether a contractual dispute is subject to its exclusive jurisdiction, they are nonetheless relevant to a discussion of whether federal question jurisdiction is appropriate for contractual disputes that do not require interpretation of FERC regulations or orders.

10

FERC stated that "[FERC's] jurisdiction to settle disputes over the meaning of rate schedules does not as a matter of law preclude state courts from entertaining contract litigation of the type raised by Edison's complaint in Oregon state court." Id.  Doing so would:

> [C]lose off from state review a wide range of conventional contract interpretation issues, whenever a contract is on file with the [FERC], even if the matter at issue had little relation to the [FERC's] exclusive jurisdiction to determine the reasonableness of rates for wholesale sales of electric power in interstate commerce.

Id.  After rejecting the argument that FERC has exclusive jurisdiction over the dispute, the FERC then rejected the argument that it should exercise primary jurisdiction over the action. Id. at 61,022. The FERC found that it did not possess special expertise in the matter, there was no special need for uniform contractual interpretation, and that the case is "far removed from the regulatory responsibilities of the Commission." Id.

While Newmont's motion to remand (#6) should be granted on the foregoing basis, the Court rejects Newmont's secondary argument that the dispute resolution provisions contained in the Interconnection Agreement and the WSPP Confirmation require that result.  The Interconnection Argument provides that "[n]othing herein shall prevent either Party from pursuing or seeking any equitable remedy available to it under applicable law, at any time, in any court of competent jurisdiction." (Interconnection Agreement ¶ 11.6 (#1-1).) The WSPP Confirmation provides that each party "(I) submits to the jurisdiction of the federal and state courts located in the County of Washoe, State of Nevada; (ii) waives any objection which it may have to the laying of venue of any proceedings brought in any such court; and (iii) waives any claim that such proceedings have been brought in an inconvenient forum."  (Mot. to Remand Ex. 6 ¶ 41 (#6-6).)   This language does not, in our view, limit the ability of any party to remove a proceeding to the federal court located in the County of Washoe, State of Nevada.  Both the state court in which the action was filed and the federal court to which it was removed are agreeable forums under the contract, and the Court's decision to remand is not based on either of the dispute resolution clauses contained in the agreements.

### III. Conclusion

IT IS ORDERED that the motion to remand (#6) is GRANTED.  The action shall be

remanded to state court for further proceedings.

IT IS FURTHER ORDERED that the motion to dismiss (#3) and the motion for leave to file surreply (#22) are DENIED AS MOOT.

DATED: This 20th day of September, 2012.

_____
United States District Judge